THE PEOPLE ex rel. John J. Healy, State's Attorney,

v.

JOHN STIRLEN.

*Opinion filed December 22, 1906—Rehearing denied Feb. 7, 1907.*

1. ATTORNEYS AT LAW—*what conduct of attorney justifies disbarment.* The vexatious refusal of an attorney to settle with a client, ignorant of the English language, for whom he has collected money, and the trumping up of an unreasonable and inflated bill for services, greatly in excess of what had been agreed upon between the parties, for the purpose of offsetting the claim of the client for the money collected, is such conduct as to warrant disbarment.

2. SAME—*attorney should protect rights of client in making contract for services.* An attorney, in making a contract with a client who does not understand or speak the English language and who is unacquainted with our customs, should carefully safeguard the interests of such client, particularly where he knows the client has taken the business out of another attorney's hands because of dissatisfaction with the progress of the case.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

E. H. MORRIS, and SAM'L K. MARKMAN, for respondent.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an information filed by the State's attorney of Cook county, petitioning for the disbarment of John Stirlen as an attorney of this court.

The testimony shows that in the early part of 1899 Tony Papa, the son of Frederico Papa, consulted William Irvin, an attorney, in reference to the collection of a judgment note dated April 3, 1895, given to said Frederico Papa by Emilio and Emanuello DeStefano for $2500, secured by a second mortgage on certain property in Chicago. Irvin recommended that they employ John Stirlen, the respondent. In March, 1899, by previous arrangement, Frederico Papa, accompanied by his son, Tony, his daughter, Mary Mazzona,

and her husband, Matthew Mazzona, went to respondent's office and an interview was had as to the collection of the money. For some time previous Julius Kline, another attorney, had been representing Papa and endeavoring to collect the note in question. As the result of the interview a written contract was entered into between Stirlen and Papa, witnessed by Matthew Mazzona and Tony Papa. It was in duplicate, each party keeping a copy. Neither copy can now be found. Papa's copy was last seen on the hearing for contempt against the respondent in the superior court of Cook county, and Stirlen does not know how he lost his copy. The three Papas and the husband of the daughter, Matthew Mazzona, all testified that the contract, in substance, provided that Stirlen was to collect the note and receive $300 for all of his fees, this amount to be paid only after he had collected the money; that the court costs for the collection were to be paid by Papa. The respondent, Stirlen, a clerk and stenographer in his office, his associate attorney, Irvin, and a witness, Richter, all testified that the contract provided that Stirlen was to receive $300 for foreclosing the mortgage which secured the note. The testimony as to the contents of the contract is very conflicting. The evidence in the record tends to uphold the contention of the Papas as to the contents, and much of it is not at all consistent with the claim of the respondent. In April, 1899, Stirlen entered up judgment in the superior court of Cook county on the judgment note in question for $2964, principal, interest, attorney's fees and costs. In July, 1899, he filed a creditor's bill in behalf of the Papas against Emanuello DeStefano, the wife of Emilio DeStefano, and others, (Emilio DeStefano having died,) for the purpose of enforcing the collection of this judgment. On May 19, 1900, he received from Mrs. Emanuello DeStefano, by her son as attorney in fact, an assignment of all the rents, issues and profits growing out of certain real estate in Melrose Park, Cook county, Illinois. This property consisted of two frame houses, which rented

for $40 to $60 per month. In June, 1900, the superior court, under said creditor's bill, appointed George Stirlen, brother of the respondent and who was a clerk in his office, as receiver of the DeStefano's property. The receiver's bond was fixed at $500, and Papa and his son-in-law, Matthew Mazzona, signed as sureties. There is testimony on the part of the Papas tending to show that they asked to have Tony Papa or Matthew Mazzona appointed receiver but that respondent objected to this. The receiver collected $40 in rent from the Melrose Park property and turned it over to respondent. After that the rent was paid direct to the respondent or to his law firm, Stirlen & Dickson. He admits that he received from this property, in rents, between $1300 and $1400, and claims that he paid out small amounts at various times, leaving in his hands between $1100 and $1200. The DeStefanos, at the time Stirlen took the note in question for collection, had title to various pieces of property in Cook county. The one upon which they had given a second mortgage to the Papas to secure the $2500 was situated on South Clark street. The first mortgage on that property was in favor of the Berkshire Life Insurance Company for $25,000, and was in process of foreclosure when Frederico Papa turned over the $2500 note to respondent. All of the property belonging to the DeStefanos was heavily mortgaged, including that in Melrose Park. The first mortgage on this last named property was for $3500, and there appears to have been a second mortgage given to one Romano. The first mortgagee on the Melrose Park property started proceedings to foreclose after judgment was entered up on the Papa note, and the Papas were made parties. These foreclosure proceedings were referred to a master in chancery, and he reported that the Papa judgment was a lien prior to the Romano mortgage on the Melrose Park property. This report seems to have been approved by the superior court of Cook county, but a decree was never prepared and filed by Stirlen to carry this finding into effect.

Further litigation against the DeStefanos grew out of other pieces of mortgaged property, to which the Papas were made parties and in which respondent claimed he appeared for them and rendered services. Several orders were entered in the superior court on behalf of the receiver in the creditor's bill authorizing the payment of certain expenses on the Melrose Park property. These orders seem to have been entered at the instance of the respondent, Stirlen, or some one in his office, although he denied that he knew anything about them and claimed that the receiver had had nothing to do with the Melrose Park property after collecting the $40; that respondent was collecting the rents himself under the assignment from the DeStefanos' dated May 19, 1900, and that he was collecting this to secure him on his fees against the Papas for the various litigations in which he had represented them, growing out of the attempt to collect the judgment for $2500. He never rendered any bill to the Papas for his services until long after the matter was taken out of his hands by them, in 1903, and never turned over any of the money collected on the rents of the Melrose Park property, though he had received from them, from time to time, various small amounts, amounting in all to something less than $100. In February, 1905, the respondent for the first time made a statement of his account with Frederico Papa. There are no dates given as to when these services were rendered, except that at the beginning of the statement is found, "February, 1899, to February, 1903," and the charges run all the way from $15 to $500 in amount, the total being $1690. There is no attempt to itemize, except in a most general way, or give any details. Respondent's testimony as to the books that he kept is very contradictory. Shortly after these matters had been taken out of his hands by the Papas, contempt proceedings were begun against him in the superior court of Cook county to compel him to turn over the moneys he had collected from the Melrose Park property. Criminal proceedings were afterwards commenced

against him. The rule for contempt was discharged by the superior court and the criminal prosecution was *nolle prossed.* In 1905 proceedings were begun against him before the grievance committee of the Chicago Bar Association, and in July of that year he filed his answer before that committee. The information was filed in this court on October 21, 1905, and answer filed on December 5, 1905. The matter was then referred to a special commissioner to take evidence, who after a full hearing reported in favor of disbarment.

In these various proceedings that have been had against the respondent his testimony is very contradictory on the question of his charges against the Papas as well as to the contract that he made with them. Before the master in chancery, on this hearing, he insisted that when the Papas came to him he understood that the $2500 note was secured by a first mortgage on the Clark street property, but in his answer in the contempt proceedings in the superior court, in his testimony in the criminal proceedings, in his answer to the grievance committee of the bar association and in his answer filed in this court in December, 1905, in each and every instance he stated that he understood the mortgage to be a second mortgage, and claimed in all these proceedings that the contract was that he was to receive $300 for looking after and protecting the interests of the Papas in the foreclosure proceedings then being taken under the first mortgage on the Clark street property by the Berkshire Life Insurance Company. In this claim that he was to get $300 for attending to the foreclosure proceedings only, he is contradicted by Frederico Papa and his son, Tony, and his son-in-law, Matthew Mazzona. He undoubtedly must have realized that his claim that he was to receive $300 simply for looking after the interests of the Papas as holders of a second mortgage only was not reasonable, and therefore in his testimony on the hearing in this case he for the first time claims that he understood that the $2500 was secured

by a first mortgage and that he was to receive $300 for fore-closing and collecting the amount. This claim is not borne out by anything else in the record. The property in question on Clark street, as he must have known, was of sufficient value so that a first mortgage secured on it could be collected without difficulty. The Berkshire Life Insurance Company's first mortgage on this property was not for the small sum of $2500, but for $25,000. The testimony of both respondent and attorney Irvin is to the effect that Irvin was to have one-half the fees that were obtained from any business that he brought to the respondent, and that on account of this agreement Irvin was to have half the fees in the Papa case. Both testified that Stirlen has turned over none of the money that he collected for rent for the Melrose Park property.

We have carefully read and examined the testimony of the respondent in the record. It is replete with contradictions, and not at all consistent with the other evidence or in itself. Not only the documentary proof that we have referred to, in the contempt proceedings and before the grievance committee and in his answer in this proceeding, but letters written apparently by him and signed by Stirlen & Dickson in May, 1901, bear out the claim of the Papas that he had agreed to collect the $2500 note and do all the work in connection therewith for $300. A letter dated May 15, 1901, says: "As to our bill for services, we do not see how we could take anything less than $300, as we had more to do in this matter than we anticipated, and instead of one lawsuit we had a half dozen lawsuits, which required a great deal of time and labor. The Romano suit itself is worth at least $300." In his itemized bill, heretofore referred to, he charges $500 for his fees in the Romano suit. From a letter written by his firm May 24, 1901, it is plain that it was the understanding of the writer of the letter that the original contract was for $300 for collecting the $2500, and not for simply foreclosing the mortgage. It is apparent that when

224—41

the respondent entered into the original contract he did not anticipate the trouble and legal work that would be required of him in trying to collect the note, but we are compelled to hold that the record conclusively shows that he agreed to collect this note for $300. While, doubtless, he performed services that by ordinary rules of charging for attorney's fees would be worth more than this amount in the absence of a special agreement, still under no circumstances was he justified in retaining, as he does retain, the entire amount of money collected as rents for the Melrose Park property. Frederico Papa himself is an Italian and cannot speak any English. His son and daughter do talk English, but it is manifest that the family is unacquainted with American ways and manners, and for this reason, as an attorney, he should have safeguarded their interests very carefully, particularly in view of the fact that he knew when they came to him that they had employed another attorney and had taken the business out of that attorney's hands because of dissatisfaction with the progress of the case.

It will serve no good purpose to discuss in detail all the evidence in this record of six hundred or more pages. It is obvious that respondent intended to have all parties interested, including the agent of the DeStefanos, understand that he was collecting the rents on the Melrose Park property in favor of the receiver under the creditor's bill in question. We do not think there is any satisfactory evidence in the record to justify respondent's claim that if the Papas had followed his advice and redeemed from the foreclosure of the mortgage on the Melrose Park property they could have collected their entire claim. The evidence as to the value of that property is not given by anyone familiar with the values in that locality and is not such as to impress us with its reliability. Even if respondent is right in this claim it does not excuse him for retaining the money, in view of the contract he had for collecting the original note for $300. Moreover, if there was a chance for an honest difference

of opinion on the facts presented as to the original contract, it was not as to the amount he was to be paid for his work, but as to the amount of work agreed to be done under that contract. It was unprofessional for him to retain all this money during all these years without making any serious attempt to settle with the Papas for his fees. They testify that they had often asked him to settle. His bill for services amounting to $1690 finds no justification from this record. His charge of over $300 for collecting the rents in question is a sample. This statement shows, on its face, that it is not worthy of serious consideration, and was prepared by the respondent simply for the purpose of offsetting, by unreasonable and inflated items of charge, all his clients' claims.

We do not intend to hold that a lawyer should be disbarred simply because he gets into a dispute with his clients over fees or for withholding funds which he has collected and which he claims on account of services, but respondent's conduct, as shown by this record, is so flagrant,—so contrary to all legal ethics,—that we are of the opinion he ought not to be permitted to continue to practice.

Judgment will be entered forbidding the respondent from further practicing as an attorney at law, and ordering that his name be stricken from the roll of attorneys in this State.

*Rule made absolute.*